The 4th District Appellate Court of the State of Illinois has now convened. The Honorable James A. Kinect presiding. Good morning. The case name is N. Ray the Marriage of Jabusch and number is 420-0021. Counsel for appellant please state your name for the record. Gina Wood. And for the appellee state your name for the record. Chris Shear. S-H-E-R-E-R. You may proceed. Thank you. Good morning. May it please the court, counsel, thank you for the opportunity to appear before you today. In July of 2019 the Jabush's and their attorneys appeared before the trial court to conduct a hearing regarding all remaining issues. As is not uncommon they spent their time negotiating their issues and chose to settle their case rather than proceeding to trial. Mrs. Jabush's attorney read onto the record the terms of the party's agreement. The oral recitation included, among other things, an agreement to divide Mr. Jabush's retirement valued at approximately $600,000 equally between the parties, to divide equally proceeds from the sale of the marital residence, and to divide equally the marital portion of Mrs. Jabush's account. After the prove-up, the court made some admonitions to the parties, asked a few questions, and at one point after requesting more details regarding the sale of the party's marital residence said, and I quote, again, I'm not trying to cause any trouble, I just want to make sure everything is clear. I don't anticipate any trouble between the two of you, but it's always those cases where I don't anticipate trouble that trouble arises. Unfortunately, the entirety of the party's oral agreement, and more specifically provisions regarding the proposed division of the CSRS accounts, were not clear and trouble did arise. In January of 2016, the Illinois legislature amended the Illinois Marriage and Dissolution of Marriage Act in a number of ways, including an amendment to Section 502A, wherein it is now required that any agreement must be in writing, except for good cause shown. This legislation, absent from the act prior to 2016, is clearly meant to assist in avoiding the exact type of problem experienced by the Jabush's in this case. The Illinois practice of family law provides an excellent analysis of why our legislature likely determined this provision was necessary. A portion of that analysis is worth quoting again today. Because oral settlement agreements can cause complications that are not as frequently a part of written settlement agreements, an attorney should carefully consider whether submitting an oral agreement to the court for approval in a dissolution prove-up is the best course, even if good cause can be established. An oral recitation of an agreement may inadvertently omit terms that should be part of the settlement, because oral agreements are seldom as well thought out as our agreements in writing. The problem is compounded when one party attempts to insert the omitted terms in the written judgment, producing inconsistencies between the record and the judgment. The analysis goes on to say the potential for appeal is high. Prior to the 2016 amendment, our appellate courts were forced to address this issue and what happens when a verbal recitation of an agreement tendered to a trial judge conflicts with the written documents that follow. The 1996 case of In Re Marriage of Lakin involved a fact pattern very similar to the case at hand. In that case, the parties agreed and orally recited to the court that they would be dividing a retirement account equally between the parties. However, between the proffer to the court and the preparation of the documents to how the tax consequences involving the distribution of that pension account would be handled. One party believed the parties would share those tax consequences. The other party believed that they would be borne exclusively by the participant within the plan. The appellate court said the property settlement between married persons, particularly where substantial financial assets are involved, cannot be concluded by the party's oral consent when it is diligently challenged by one spouse before a decree has been entered. Now, it's laudable that the child judge in our case was attempting to conclude matters for these parties. However, it appears that allowing the prove-up was more of a means to lock them into their agreement. It was an abuse to allow the Jiboushes to place their agreement verbally on the record in the absence of a written agreement and without good cause shown. As a side note, it would be difficult to guess what good cause would have been in this case. The first error committed by the trial judge was allowing the parties to a 39-year-plus marriage with a net estate valued in excess of $2.2 million to recite their agreement onto the record in direct violation of 502A. The second error occurred when the trial court One of the judges has a question. I think his volume is not good. Oh, I'm so sorry. Tom Harris here, and I'm sorry if you can't hear me. Can you hear me? Yes, I can, Justice. Okay, if you could just bookmark where you're at in your argument here, but I needed to ask you a question. Didn't your predecessor and representing respondent in this case specifically acquiesce to the trial court proceeding in the way that it did in terms of accepting the terms of the settlement agreement orally? And if that is the case, why does that not serve as an affirmative waiver to any claim of error at this point? Your honor, I don't believe the parties can bargain away the statutory requirement that those agreements be placed in in writing and tender to the court in written form. I don't believe that's something the statute envisions. I think this is a protection upon parties and a protection upon our courts to ensure that full comprehensive and fully negotiated agreements are tendered to the court versus these somewhat general and more vague oral prove-ups. I think the statute would indicate that the parties could waive that requirement and the court could accept that waiver if the legislature determined otherwise. And it is clear that the legislature said must be in writing. Must. That is a mandate for courts and that's a mandate for litigants unless good cause can be shown. I don't think good cause is avoiding the mandate. I think good cause might be, although it's not defined within the statute, something along the lines of a terminally ill litigant may need to have resolution of the distribution of an estate before an appending death or a pregnant litigant and the opposing party may wish to have issues resolved quickly and a judgment entered before the birth of a child who's not biologically related to both parties and would not want to be presumed to be a child of the marriage. In this case, it was the judge's job to make sure that procedure was followed according to the law and I don't believe either party could waive that. I'd also indicate that the second issue, even if we believe there were the ability of the parties to get past the 502A provision, the second error occurred when the trial court accepted written documents that did not conform with the party's recited agreement. The oral recitation of the party's agreement regarding the CSRS pension was simply, and I quote directly out of the transcript, Mr. Jabush would receive one half of the marital portion of Mrs. Jabush's state of Illinois pension pursuant to QLDRA. That's it. That's all that was said. Many critical terms necessary to fully and completely allocate this asset were never tendered to the court. For example, how the parties defined marital portion, whether or not permissive credits would be included or excluded from the marital portion, whether or not cost of living increases and adjustments would be allowed, what death procedures would be used. Nothing was said regarding the specifics of the proposed QLDRA, nor was a calculation order addressed. None of these critical and necessary terms were provided to the court. And so, as often is the case, when drafting, when the drafting process occurred, it was determined more terms were needed to finalize this matter. However, when the trial judge accepted a judgment of dissolution of marriage and companion documents prepared by the Petitioner's Council, which included terms and companion orders that were never part of the party's initial agreement, that was an abuse of discretion. The judgment of dissolution of marriage that was entered by the court includes language recited to the court, specifically in paragraph 8 on page 9. However, Petitioner's Council added five subparts, specifically paragraphs 8a through e, all of which were new terms. Now, granted, terms that should have been discussed and read into the record, maybe not according to how they were drafted by the petitioner, but certainly terms that were important, but that was done after the fact, and it was done over the respondent's objection because the respondent indicated to the court in response to the motion to enforce the oral agreement, he didn't agree with how those added terms were drafted. And accepting those documents over the objection of the respondent was an abuse of the trial court's discretion. Both parties have cited to in re marriage a frank. That is a case that states clearly trial court's acceptance of a judgment of dissolution of marriage, which included terms not part of the party's written marital settlement agreement, in that case there was even a signed marital settlement agreement, in the absence of wife's consent was error. The trial court could not add terms related to husband's pension that were not negotiated and signed off within the written agreement. Most recently, in in re marriage of Selecki, the appellate court overturned a trial court's order for the same reason, and stated the trial court may not modify nor add terms to the party's agreement, even if the court believes those terms make the agreement conform to the law. So in this case, once the trial court was presented final documents that did not comport with the record, and were objected to by one party, the judge should have either sent these parties back to the negotiating table to attempt to arrive at a complete and comprehensive written agreement regarding the allocation of their estate, as well as an agreed upon quildron calculation order, or the matter should have proceeded to trial. Yes your honor. Didn't the court rely upon Respondents Demonstrative Exhibit A in making its determination? Respondents Demonstrative Exhibit A was not presented to the trial court until the December 2019 hearing on the motions to vacate. The trial court was not tendered that exhibit at any time prior to that, not at the prove-up, and not at the motion for entry of the judgment. That was done after the fact and is stated within our brief. Did the respondent object to the court's consideration of Demonstrative Exhibit A? No. Isn't that a problem for you then? No, because Respondents Demonstrative Exhibit A doesn't tell us anything about permissive credits, the inclusion or the months that are involved, and it was prepared for a purpose completely separate from the preparation of a quildron calculation order. So that Respondents Demonstrative A, for starters, is deemed just that, a demonstrative exhibit, and doesn't provide any of the details that would allow us to know the specifics as to the terms of what's necessary to complete a quildro and a calculation order when we divide an Illinois pension. So why the petitioner states that that was relied upon and why the trial court may or may not have relied upon it, and I'm not sure the trial court did, is unclear, particularly when the figures that were used by the petitioner within the calculation order and the quildro don't even match what is in this demonstrative exhibit. The months for the denominator and the do not match this exhibit, and so I don't think there was, I mean, there was no reason to object to this because if the petitioner wanted to bring this to the court's attention at the motion to vacate hearing, it was a demonstrative exhibit that was prepared on a pretrial basis, never tendered to the court for any purpose until the December 11th motion to vacate, and quite frankly, Respondent didn't have an issue with the court seeing it, but it's not very relevant to what issues were before the court at that time, is our position, and so we believe that when the trial court denied Larry's motion to rectify these problems, to rectify the fact that an oral recitation was accepted without a written document and contravention of the act, to rectify the second issue that the court accepted documents that did not conform with that recitation, the trial court also abused its discretion. First of all, we never should have gotten to a motion to vacate. That judgment never should have been entered, but if we disregard those first two issues and look purely at the motion to vacate, the trial court erred when it found there had not been a mutual mistake or a unilateral mistake. There's clearly been a mistake here. It's the same mistake the Lakin court was faced with. Both of these parties evidently had different understandings of how to define marital portion, and what they didn't do is delve into those details evidently with each other, and specifically not with the trial court when they recited a very general one-sentence phrase in regard to how to divide this very important asset. One party thought permissive credits would be considered marital and included. The other party did not. How any reading of the pleadings and the record in this case could indicate there wasn't a mistake is difficult to understand. Secondly, the court erred when it went past that and said even if there were a mistake, essentially, these credits aren't marital. They wouldn't be divisible. So the trial court blamed Larry for not bringing to the trial court's attention at the prove-up that permissive credits should be included, even though there was also nothing placed on the record about excluding those records. But the trial court also improperly shifted the burden to Larry regarding the classification of those credits as non-marital versus marital. Despite the evidence presented showing these credits were purchased 12 years after the parties married with marital funds from a joint marital bank account, the court states in the December 11, 2019 order that portions of the permissive service may, and I use her term, may have been purchased with non-marital accumulations of sick time, vacation, etc., and then awards those credits exclusively to Ms. Jiblish, which contradicts both Section 503b of the IMDMA, wherein it is a party's burden to overcome the presumption these benefits are marital by clear and convincing evidence the benefits were acquired by a method listed within Subsection A of 503. The order also contradicts non-standing case law dealing with the division of retirement assets. It's difficult to understand how the trial court could disregard the Illinois Supreme Court's decision in Zamudio, which addresses nearly the identical issue in this case, wherein a military member whose service completely predated the marriage by 20 years was found to have purchased credits to allow for retirement with marital funds during the marriage and those credits were considered marital. How good are you, are you suggesting that the record shows that no sick time from prior to the marriage or personal days from before the marriage or vacation days from before the marriage were part of the permissive service? The record shows that a check was issued to the state retirement system on January 15, 1992. I'm looking at Appellant's Appendix 234. Check issued January 17, 1992 for $7,393.68 to the state retirement system issued by Lawrence J. Bush and Mary J. Bush on a joint account. There was no evidence presented that there were any non-marital credits that were used and I'd suggest if there were, I mean if the court had had an evidentiary hearing on this matter at a trial, the parties had been unable to settle what was included and what wasn't included as permissive credits, there would be, I'm not sure how the presumption could be overcome when it's clear that these credits were purchased with cash used by the parties in their joint account. I mean but how does that check or that that transaction show that that was the only thing that was needed to to get all these permissive credits? Well it states that you have that there's an amount that's ordered to be in the amount of $8,639 I believe. Under the IRS Section 415 limitations, you can only pay $7,393 of the required contributions and that payment has to be received before calculating the retirement annuity. That check was issued, it was issued out of a joint account, it was issued with joint funds and it was issued in the amount of $7,393.68. So there's a huge burden under 503-B for a participant to overcome the presumption that those credits are in fact marital. It's a clear and convincing presumption. Quite frankly I don't know how the court just on the motion to vacate a loan evidence could find that that was overcome and it's notable that within the court's order in that December 11th order, she doesn't say they're non-marital, she says they may be, they may be and attributes those to exclusively Mrs. Jiboush's portion of the value of the CSRS account which is a substantial detriment to Mr. Jiboush who shared his retirement equally with his ex-wife but is now receiving almost half of what he should have received. And so all of us I'm sure would agree that resolving cases by settlement is certainly paramount to the best interests of most parties and to the courts and it's it's you know heavy dockings but though our statute even promotes amicable settlement but there are rules in place for how those settlements are to be handled. Those rules were enacted for a reason. They were enacted to avoid the potential troubles that were of concern even to this trial judge. Troubles which unfortunately came to fruition in this case as a result of not following those rules and so for those reasons and the reasons stated within our briefs, your honor, your honors, we're asking this court to overturn the trial court's denial of the motion and to remand this case to the trial court for further hearing. Thank you. Thank you. We'll hear from you on rebuttal. I please the court. Ms. Wood. Council's focus this morning has been primarily on the July 30th proceedings. We have a transcript for that. Issues were also raised with regard to the August 2019 entry of judgments. We have no transcript of that hearing and what we're here for today they've appealed on their motion to vacate and their amended motion to vacate. The standard of review in this situation is for an abuse of discretion and without a clear record in this case we we don't believe that they can meet their standard to demonstrate that there has been an abuse of discretion. Well it's pretty it's pretty clear that there's been an abuse of the statute. Whether that's an abuse of discretion in this case will be for us to decide but the statute's pretty clear. It is and but we believe the statute's been complied with. The statute says that it does not require a writing in all instances. It requires a writing unless there's good cause shown with approval of the court. Now first of all without a transcript of the hearing from December 11th we we really can't see where there would be a basis for finding that the court abuses discretion but the reality is as was touched on a bit earlier respondents counsel and responded himself participated in this alleged statutory violation. It's just simply a new way of them Mr. Jaber's trying to change the deal. On July 30th the we were scheduled for trial and instead of proceeding to trial we held a settlement conference and that resulted in an agreement. Judge Asher thoroughly thoroughly admonished everyone on the record had the terms of the agreement transcribed on the record. Respondent agreed that he had heard the terms he understood the terms and he agreed with the terms. Respondent's attorney was specifically asked whether there was anything else to add and the response was I didn't have any other questions that's in the record or reported proceedings pages 14 to 15. There was no objection with regard to section 502a at that point. The issue of being in writing was not raised at that point. Days later Mr. Jaber attempted to renegotiate the agreement. Those exchanges or communications are in the record. Judgment was entered and at that time there's no nothing in the record indicates that the issue of section 502a and compliance with it was raised. On November 4th the trial court scheduled an evidentiary hearing on their motion to vacate. So there was over a month for a court reporter to be lined up. The hearing was held and scheduled for December 11th and on December 10th Mr. J Bush filed a motion for leave to file an amended motion to vacate. Now timeliness aside that was considered. Judge Asher's December 11th order indicates in the second paragraph Larry's motion to vacate and amended motion to vacate are denied. In their amended motion to vacate they raised the issue of section 502a and compliance with those terms for the first time. Paragraph 7 of their amended motion to vacate cites that specific statute and says here there was no signed agreement by the parties. Petitioner filed a motion to enforce a judgment that never occurred. There was an evidentiary hearing the following day the day after the their amended motion was filed. There was no transcript just exhibits demonstrative exhibit a that they prepared was admitted without objection according to the docket entry in the common law record at page 357. And there was no written objection to the use of demonstrative exhibit a prior to the hearing after it was included with our response to their motion to vacate. Now the December 11th 2019 order says that the amended motion to vacate is denied. Therefore because the amended motion raised the section 502a issues we believe that it's the denial or consideration of that is implicit in a ruling on December 11th that good cause existed with court approval way back on July 30th 2019. Had there not been good cause with court approval then that issue was squarely before Judge Asher at the hearing on December 11th. She did not grant the motion to vacate so it's our position that the court's finding the good cause existed with court approval on July 30th is implicit in the denial of their amended motion to vacate just as implicit as the order granted their motion for leave. It didn't explicitly state that their motion for leave to file the amended motion was granted it just simply said the amended motion was granted. On top of that nothing in the record shows that they have ever argued that there was no good cause. Their amended motion to vacate common law record page 317 specifically prefaces a statement with should the court feel the good cause was shown. So there's some implication that maybe the court had already determined the good cause had been shown. There's no argument in their opening brief filed with this court that there was no good cause only a mention on page 15 that the court did not make a good cause finding on August 28th. There is no substantive docket entry on that date no bystander report of the hearing on that date but we believe you know it wouldn't have been an August 28th determination of whether good cause existed. The statute requires that the determination be made prior to proceeding to an oral prove up so that should have been on July 30th. Council let me ask a question. Obviously a court reporter was there when the settlement agreement was read into the record. Correct. Where is the reporter at the rest of these proceedings? How do you do it in Sangamon County? Does somebody have to say oh we really need a reporter or is one provided? Sometimes one is provided if one's not provided then typically the procedure is that if it's known beforehand then it will be made known and if it's not known until the last minute then typically the parties are given the option of proceeding without a court reporter or scheduling it for a time when a court reporter would be available but the parties always have the court reporter. I can tell that the court that the August 28th hearing in Sangamon County the 8 30 a.m. hearings they're basically status hearings they are you know short orders short arguments not a lot of undivided attention by the court typically several several matters are scheduled and docketed at that time. Let me ask the question why given the fact that you knew both sides knew right away that there was a matter of contention whether you call it the respondent trying to renegotiate or you call it the respondent saying stuff was left out of the oral settlement agreement that was known in when? Late July early August? It was very early August. Okay why didn't the parties go back into the judge right away with a court reporter and straighten this out before we get this far down the pike? Both sides knew that this was going to be a problem. We believe that it was a problem where there shouldn't have been one we believe that there was a meeting of the minds and for there to be any suggestion that that the respondent had different numbers in mind at the time of the settlement the record belies such assertion. Their pre-trial memorandum in the common law record at page 146 indicated that petitioner's non-marital portion of this pension is 68.5 percent of each monthly payment. Now that 68.5 percent directly aligns with their demonstrative exhibit A. The calculations that were provided to the court and that Judge Asher entered in August are consistent with those calculations. So as we've indicated elsewhere it started with Mr. J. Bush attempting to renegotiate the division of the retirement accounts and then it moved on to this issue a few weeks later. I believe it was around mid-August. So two or three or four weeks or so about three weeks after we appeared before Judge Asher on July 30th. And their indication was well after further reflection we think we made a mistake. So we propose to fix that mistake by changing these numbers. Well that wasn't contemplated when our client signed off on the agreement. Does the 68 percent change or does the dollar amount change? The 68 percent change is under what they've ultimately proposed in their motion to vacate and their amended motion to vacate. They are suggesting that in our quildro the quildro that Judge Asher signed off on it provided for 134 months being the marital portion. They've proposed in filings with their amended motion to vacate and in this court that the marital months be determined to be 240.5. So it goes from being 31.5 percent to 56.65 percent which would leave my client with just a little over 40 percent of her portion being non-marital compared to the 68.5 percent that everybody had in mind on July 30th when the settlement agreement was reached. So sir may I ask you a question? Please. At page two of the appellant's reprisory there's an indication that it's your brief that there is an insufficient record on appeal to support the claim of error and the appellant indicates that there were various items that were tendered in the appendix to appellant's brief and therefore we therefore have a sufficient amount of information to supplement the record by way of attaching things to an appendix. There has to be a motion to supplement the record. My question to you is are the things that are attached to the appendix to appellant's brief but that which otherwise do not appear in the record are they necessary for this court's determination of the issues? In other words, absent the things in the appendix can we find the information necessary to determine the issues on appeal in the record? I apologize for the pause. I'm scanning quickly through their appendix and nothing, I apologize, nothing jumped out to me as not being also included in the record that has been prepared in this case. A lot of it's duplicative. About the transcript of the proceedings that took place on July the 30th? Yes, that is in the report of proceedings. But I believe everything that they've submitted in their appendix is consistent with documents that appear in the record. The bottom right of each page appears to have a stamp from the circuit clerk's office. Okay, thank you. If I'm not understanding your question I certainly apologize if I'm not finding it quickly. I apologize for not noticing it sooner. No, that's you answered it if it duplicates what's in the appendix, duplicates what's in the record. That was my question. Okay, thank you. Counsel, I have a question. Yes, sir. The agreement written to the record was for respondent to receive one half of the marital portion of petitioner's pension. Is that correct? That's correct. Did he? I know it sounds simple, but did he get one half of it? Yes. Of the marital portion? Yes. Okay, and what calculation or what is your argument why the amount that he got represents one half of the marital portion? Well, the issue that they've been raising with their motion to vacate and why they've appealed to this court concerns our client's permissive credits. It's not clear, you know, as a purely factual matter, it's not clear whether those should be considered marital or non-marital. It depends on a variety of factors. That was part of the hearing that was held on December 11th. Let me stop there. If it's not clear, then how do we know that the agreement was fulfilled? If it's unclear whether he got half, then how do I know that this is something that should be approved? Well, that agreement was reached as to classification on July 30th and prior to July 30th. As I indicated, it was in their pre-hearing memorandum that 68.5 percent of the pension was non-marital. Everything that's happened after that has been an attempt by Mr. J. Bush to increase his portion beyond that 68.5 or the trying to augment the marital portion beyond what was agreed upon on July 30th. Now, even though we believe that there was a meeting of minds on July 30th, Judge Asher nonetheless had an evidentiary hearing on December 11th and gave them every opportunity to get into the merits of their arguments and the substance of everything that they had to say. Following that hearing, she entered an order indicating that the evidence is inconclusive that Mary's permissive service is marital. They were suggesting that it was 100 percent marital and Judge Asher said there was not a mutual mistake of fact because Mary testified that she was aware that the marital portion being divided by the parties was the regular months of service earned by Mary during the party's marriage. So Judge Asher then took it one step further to determine whether the agreement was unconscionable even though that term is is not contained within her order. I determined whether, you know, holding Mr. J. Bush to the agreement that had been reached was unconscionable and clearly her decision is written in a way to indicate that she found it's not unconscionable and that he would be bound by the agreement that he reached. Well, if there was a mistake made in preparing Exhibit A, is your argument that respondent having made that mistake is bound by it and there's no way to go back and fix that? It's irreparable. Well, it boils down to the question whether it was a mistake or it was not a mistake. Her testimony according to Judge Asher's order indicated, my client's testimony indicated, that the purchase of permissive service through the early retirement incentive program was done with non-marital funds. So it's our position that it's not to be divided, it's not marital and there was no inaccurate calculation, that their calculation was correct, that we relied on that and that's what everybody agreed to be the calculation when the settlement was reached on July 30. But at the end of the day, we don't know necessarily what arguments were made to Judge Asher on December 11th. We don't know what sort of insights Judge Asher may have shared on December 11th because we don't have a report of proceedings from that date. I see that I'm running low on time so I wanted to shift gears to the issue of unilateral mistake and we pointed out in our brief that respondent did not argue on appeal that a unilateral mistake on his part occurred. Their amended reply brief indicates that he addressed unilateral mistake on page 22 of his opening brief. But page 22 of their opening brief basically quotes the an appellate court decision that references unilateral mistake. There's no analysis, no application of law to the facts of this case. So again, we feel that that issue has been forfeited. The motion to vacate didn't specify, their initial motion to vacate with the trial court in September did not specify that there was a unilateral mistake. Instead, it was written in pretty broad terms which required us to decipher their to their request for relief. Their amended motion to vacate mentioned unilateral mistake but requested that the court either enforce the judgment as recited on the record or in the alternative vacate the order based on mutual mistake of fact. Their prayer for relief did not reference unilateral mistake. So we believe that that issue is not properly before the court. The only issue is whether there was a mutual mistake. We don't believe there was a mutual mistake. We don't believe that the record supports a finding that there could have been a mutual mistake warranting the grant of their motion to vacate. I see that I'm out of time. I'd be happy to answer any further questions. I see none. Thank you, counsel. Thank you for your consideration. Rebuttal. Thank you, your honors. First of all, I don't believe the statute envisions that a court can retroactively retrofit to comply with the mandates of 502A. Council appears to be suggesting that in December of 2019, the trial court made some type of good good cause shown finding. I don't see anywhere in the December 2019 order where that is found and I don't believe that the legislature intended for that to be done after the fact. It's to be done at the time. And this case is a perfect example, as are the predecessor cases that have been discussed within the briefs, as to why we want written agreements with parties. We get sloppy when we read things on the record. We leave out details. We think about things we weren't necessarily thinking about. We don't hold people to their pre-trial memorandum when individuals place a specific comprehensive agreement on the record without citing to those terms. There's no evidence that those pre-trial memorandums were part of the deal. In fact, if they were, Mrs. Jebush's pre-trial memorandum doesn't list any part of her CSRS account as being non-marital. Not a single part of her CSRS account does she list as non-marital, despite the fact that she lists the number of other assets as being her non-marital property and her attorney read into the record at the time that she did the pre-trial memorandum. At no time in either did the pre-trial memorandum or the prove-up was any part of the CSRS considered to be non-marital. Larry, however, does concede there were pre-marital contributions to this account. And so, to follow up on the Justice's question about whether he forgot about that or didn't know about that or made a mistake, a mistake was made when it came time to put pen to paper on the actual deal itself, and this often happens when attorneys in practice do not prepare quadros and quildros until after the deal is made, because those quadros and quildros include a substantial number of very significant provisions that need to be negotiated by parties as part of the deal. You can run into a situation where if a judgment is over 30 days in age, the trial court can lose jurisdiction to deal with how quadros and quildros should be read. Larry immediately brought to the trial court's, well, first immediately brought to counsel's attention right after the prove-up, we made it, we didn't include permissive credits, the numbers are wrong, and pointed out that even the numbers that Mr. Shearer, trial counsel, used in the quadro, or excuse me, the quildro and calculation order, don't line up with Respondents A if we were even going to use Respondents A for that purpose. Mr. Jaboush brought it to the trial court's attention in the August hearing, and the trial court chose to enter a judgment that did not conform with the party's oral agreement over his objection. Had the trial court entered a judgment that said exactly what the oral prove-up said, that Mr. Jaboush would receive one-half of the marital portion of the CSRS account, that could have been a good way to end the issue, because at that point then, the court would have been faced with having to clarify or enforce that order and define what the marital portion is at that stage. Case law and the statute say marital portion is what these permissive credits are made of, so for anyone to suggest that there should have been an assumption that they weren't marital, these permissive credits, I think, is difficult to ascertain from the record. Lastly, the December 11, 2019 hearing was not an evidentiary hearing on what part of the CSRS account would be considered marital versus non-marital. It was an evidentiary hearing on whether or not there had been a mistake, and just the pleadings themselves would indicate, and the fact that a judgment was entered over the objection of the respondent, is there was not a meeting of the minds here. They could not agree, like the parties in Lakin, like the parties in Zamudio, as to what would or would not be part of the more intricate details of the deal. We are courts of equity. We are to try to make sure cases are resolved fairly, and for this trial judge, seemingly to say, well, Mr. Jabush didn't bring it to the trial court's attention at the prove-up, and Mr. Jabush had this respondent's exhibit that didn't get presented to the court until December, and Mr. Jabush somehow needs to prove that the permissive credits are marital, is wrong. It's quite frankly wrong, and so from the very beginning, when an oral agreement was accepted by this court without good cause, and when documents were accepted that were over the objection, and the motion to vacate was denied when Larry was appropriately trying to rectify these errors, those were all abuses of the court's discretion, your honors, and we're respectfully requesting this court overturn those decisions. Thank you. Thank you, counsel. We'll take the matter under advisement.